| | |
|---|---|
| BLUE ZONES, LLC, a Delaware limited liability company, | Case No. 17-CV-5097 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| DWIGHT C. HARTLEY, individually and doing business as Miticorp, the "Hartley Group," and/or "Premium Gold"; PREMIUM COSTA RICA PRODUCTS, LLC, a Texas limited liability company; HARTLEY RANCH ANGUS BEEF, LLC, doing business as Miticorp, a Texas limited liability company; MITICORP LTD., a Costa Rican company; HARTLEY FOODS, INC., a Texas corporation; and CURTIS J. BROOKS, individual, | |
| Defendants. | |

Tom Monagan, Joseph V. Norvell, and Matthew D. Witsman, NORVELL IP LLC; Edward P. Sheu and David G. Schelzel, BEST & FLANAGAN LLP, for plaintiff Blue Zones LLC.

Richard L. Schwartz, WHITAKER CHALK SWINDLE & SCHWARTZ PLLC; and Barry M. Landy, CIRESI CONLIN LLP, for defendants Dwight C. Hartley; Premium Costa Rica Products, LLC; Hartley Ranch Angus Beef, LLC; Miticorp Ltd.; and Hartley Foods, Inc.

Plaintiff Blue Zones, LLC ("BZL") brought this trademark-infringement action

against defendant Dwight C. Hartley and a number of entities that are affiliated in some

way with Hartley. ECF No. 52.[1] This matter is before the Court on defendants' motion

to dismiss for lack of personal jurisdiction, lack of subject-matter jurisdiction, and

failure to state a claim. ECF No. 62. The Court held a hearing on defendants' motion on

August 9, 2018. ECF No. 94. For the reasons discussed on the record at that hearing

and for the additional reasons described herein, the Court finds that it does not have

personal jurisdiction over any defendant except Miticorp Ltd. ("Miticorp"). The Court

further finds that some (but not all) of the claims against Miticorp do not meet the

pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544 (2007).

## I. BACKGROUND

### A. The Parties

In the early 2000s, author Dan Buettner and a team of researchers identified five

regions in the world that had a high concentration of male centenarians: the island of

Okinawa in Japan; the island of Sardinia in Italy; the city of Loma Linda in California;

the island of Ikaria in Greece; and the Nicoya Peninsula in Costa Rica. Am. Compl.,

ECF No. 52, ¶¶ 31-38. Buettner and his associates refer to these "longevity hotspots" as

"Blue Zones." *Id.* ¶ 32. After publishing a best-selling book identifying characteristics

---

[1]The amended complaint also asserts a cybersquatting claim against an individual named Curtis Brooks, whose relationship to Hartley is not clear. ECF No. 52 ¶¶ 178-83. Brooks has not yet been served or made an appearance, and thus the Court does not treat him as a defendant for purposes of this order.

that are common among long-living inhabitants of the Blue Zones, Buettner formed

BZL in 2009. *Id.* ¶¶ 39-40, 42. Since then, trademarks and service marks owned by BZL

have been used in the marketing of a wide variety of goods (e.g., trail mix and water).

*Id.* ¶¶ 43, 46. A number of BZL's marks are registered with the U.S. Patent and

Trademark Office ("USPTO"), and BZL has a number of trademark applications

pending before the USPTO. *Id.* ¶¶ 49, 51-52. The Court will collectively refer to BZL's

marks as the "Blue Zones Mark."

Hartley used to live and practice law in Texas but now lives and runs various

businesses in Costa Rica. *Id.* ¶ 2. Hartley operates a group of companies, including

defendants Premium Costa Rica Products, LLC ("Premium"), Hartley Ranch Angus

Beef, LLC ("Hartley Ranch"), Miticorp, and Hartley Foods, Inc. ("Hartley Foods"). *Id.*

¶¶ 23-29. These companies—to which BZL sometimes refers as the "Hartley Group"—

produce and market food products from Costa Rica. *Id.* ¶ 30.

### B. Trademark Dispute

BZL alleges the following in its amended complaint:

In April 2016, Hartley contacted Buettner to inquire about licensing the Blue

Zones Mark. ECF No. 53. Hartley told Buettner that Hartley Foods "own[s] a well near

Nicoya"—the Blue Zone in Costa Rica—"with capacity approaching 400,000 bottles per

day." *Id.* Buettner expressed a willingness to discuss the possibility of licensing

Hartley Foods to use the Blue Zones Mark in marketing Nicoya water, but made no firm commitments. *Id.*

The parties did not speak again until March 2017, when one of Hartley's employees, Gloriana Echeverria, contacted BZL to set up a meeting "to secure a license to use the BLUE ZONES Mark with food products and . . . a series of speaking engagements for cruise lines stopping in Costa Rica." Am. Compl. ¶ 60-62. Also in March 2017, Alice Robie—who held herself out as the President of New Business Development of Miticorp—contacted David Brown of Graze Foods, LLC ("Graze"), which handled inquiries about using the Blue Zones Mark in Costa Rica. *Id.* ¶ 63. After Robie scheduled a phone call with Brown and Amelia Clabots (BZL's Chief Operating Officer) to discuss licensing opportunities, Hartley sent an email to Brown informing him that "[Robie] has no authority to discuss such matters. I am available should you care to discuss." *Id.* ¶ 64-65.

To clear up the confusion, Brown and Clabots called Hartley. *Id.* ¶ 66. During the phone conversation, Hartley expressed interest in obtaining a license for the Blue Zones Mark. *Id.* He also represented that he lived in Costa Rica and was doing business as Miticorp. *Id.* Eventually, the parties decided to execute a Non-Disclosure Agreement ("NDA") to facilitate further negotiations. *Id.* ¶ 67.

As the negotiations progressed, Hartley made a number of dubious averments: that his companies sold millions of dollars in frozen food products to Walmart, *id.* ¶ 73; that he sold products to "every major retailer" in the United States, *id.* ¶ 74; that he had licensing deals with TGI Friday's and Jack Daniels, *id.* ¶ 75; that Hartley Ranch (or possibly Hartley Foods) was the largest grass-fed organic beef supplier in the United States, *id.* ¶ 76; that his Costa Rican ventures operated under an umbrella entity called "Premium Gold International Foods" (an entity that had dissolved in 2016), *id.* ¶ 77; and that he had purchased a factory in Costa Rica for $15 million, *id.* ¶ 78.  Hartley also promised to expose the Blue Zones brand "to tens of thousand of cruise line passengers every week," despite the fact that he did not have a relationship with any cruise line that would enable him to deliver on that promise.  *Id.* ¶ 79.

BZL decided not to give Hartley a license to use the Blue Zones Mark and, in response, Hartley threatened to use the Blue Zones Mark without a license.  *Id.* ¶ 69-70; ECF No. 54-6.  Hartley also repeatedly accused BZL of violating the NDA.  *See, e.g.*, ECF No. 54-8 ("I'm disappointed I never heard back from your team on any proposals. [I'm] more disappointed that the terms of our NDA were violated[.]").  Buettner asked Hartley to explain *how* BZL had violated the NDA, but Hartley never responded.  Am. Compl. ¶ 84; ECF No. 54-8.  Buettner also expressed his "trust from both a legal and

ethical point of view, that [Hartley would] diassociate [himself] and [his] products completely from using Blue Zone or Blue Zones in anyway." ECF No. 54-7 at 2.

In September 2017, Miticorp participated in "Natural Products Expo East," a trade show in Baltimore, Maryland. Am. Compl. ¶ 87. The directory of exhibitors identified Miticorp as an exhibitor from "Plantation, FL" that sold "[p]roducts from the 'blue zone' of Costa Rica." ECF No. 54-9 at 2. Among the sample products that Miticorp displayed was a "coconut with straw" product on which appeared the Blue Zones Mark. ECF No. 68 ¶ 16.

The following month, Premium filed a petition to cancel two of BZL's trademark registrations with the Trademark Trial and Appeal Board ("TTAB") in Alexandria, Virginia. Am. Compl. ¶ 90. Specifically, Premium sought cancellation of one registration that covers "'bottled drinking water; Drinking water; Spring water; [and] Water beverages' in International Class 32" (Am. Compl. ¶ 90) and another that covers "'On-line retail store services featuring foods; food products; coffee; tea; seeds; beverages; clothing; cosmetics; fragrance products; general merchandise; and general consumer goods' in International Class 35" (Am. Compl. ¶ 91). Premium alleges that the mark is "deceptively misdescriptive, primarily geographically descriptive, and primarily geographically deceptively misdescriptive[.]" Am. Compl. ¶¶ 92-93.

## II. ANALYSIS

"This Court has repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Gurman v. Metro Hous. & Redev. Auth.*, 842 F. Supp. 2d 1151, 1153 & n.2 (D. Minn. 2011) (collecting cases). Unfortunately, BZL has not heeded those warnings. This should be a rather straightforward trademark-infringement case against Miticorp. Instead, BZL has filed an amended complaint that spans almost 200 paragraphs and that asserts ten counts against each of six defendants. Among those counts is a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a sure sign that BZL's attorneys have thrown everything up against the wall in the hopes that something will stick.[2]

Defendants have now moved to dismiss the amended complaint for lack of personal jurisdiction, lack of subject-matter jurisdiction, and failure to state a claim. ECF No. 62.

### A. Personal Jurisdiction

Under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant

---

[2]The Court refers BZL's attorneys to the profane but illuminating essay by Ken White entitled "IT'S NOT RICO, DAMMIT," which can be found at http://www.popehat.com/2016/06/14/lawsplainer-its-not-rico-dammit (last visited Sept. 27, 2018).

. . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). Thus, whether this Court has jurisdiction over Hartley and the other defendants depends on whether a Minnesota state court could exercise jurisdiction over them. *See Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996).

Minnesota's long-arm statute is as broad as a long-arm statute can be: It authorizes Minnesota state courts to exercise all of the jurisdiction permitted under the United States Constitution. As a result, this Court has personal jurisdiction over a defendant if the exercise of such jurisdiction by a Minnesota state court would be constitutional. *See Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006) ("Because Minnesota's long-arm statute is coextensive with constitutional limits, we need only determine whether the assertion of jurisdiction over this defendant offends due process.").

The Due Process Clause permits state courts to exercise personal jurisdiction over a nonresident only if that nonresident has sufficient contacts with the forum state that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted). Only when a "defendant purposefully avails itself of the privilege of conducting activities within the forum State" does the Constitution permit the forum

state to exercise personal jurisdiction over that defendant. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotations omitted); *Johnson*, 444 F.3d at 955 ("Personal jurisdiction exists only if the contacts between the defendant and the forum state are sufficient to establish that the defendant has purposefully availed himself of the benefits and protections of the forum state.").

### 1. Hartley

Hartley argues that the Court lacks personal jurisdiction over him because he had no contacts with Minnesota in his personal capacity. *See* ECF No. 65. Instead, all of his alleged contacts with the state were in his capacity as a principal of Miticorp. Am. Compl. ¶ 66. The law supports Hartley's position, as "[t]he law is clear that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity." *Ark. Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 574 (8th Cir. 1986).

BZL argues that, notwithstanding the general rule, the Court still has personal jurisdiction over Hartley (and Miticorp) because (1) Hartley (and Miticorp) did things outside of Minnesota that hurt BZL in Minnesota (namely, displaying the Blue Zones Mark on products at a trade show in Maryland and directing Premium to file a petition with the TTAB in Virginia); (2) Hartley (and Miticorp) signed the NDA—a contract with

BZL; (3) Hartley (and Miticorp) engaged in unsuccessful negotiations with BZL; and (4) Hartley is an alter ego of Miticorp and thus, because the Court has jurisdiction over Miticorp, the Court necessarily has jurisdiction over Hartley. *See* ECF No. 75.

For the reasons stated on the record at the hearing, the Court finds each of these arguments unpersuasive. To briefly summarize:

First, the Supreme Court has held—recently and clearly—that before a state can exercise personal jurisdiction over a defendant, the defendant's conduct must do more than cause harm to a resident of that state; instead, the defendant's conduct must *itself* be connected to the state. *See Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Fran. Cty*, 137 S. Ct. 1773, 1781 (2017). In other words, the conduct that gives rise to the lawsuit must be connected to the *forum*, and not merely to the *plaintiff*. *Id.* Neither Miticorp's display of products with the Blue Zones Mark at a trade show in Maryland nor Hartley's directing Premium to file a petition with the TTAB in Virginia had any connection to Minnesota.

Second, the Eighth Circuit has held on numerous occasions that an out-of-state resident does not subject himself to the personal jurisdiction of a state merely by entering into a contract with a resident of that state—much less by entering into *unsuccessful* contractual negotiations with a resident of that state. *See, e.g., Jones v. ITT Sys. Div.*, 595 F. App'x 662 (8th Cir. 2015) (per curiam) ("merely entering into contract

with forum resident does not provide requisite contacts between nonresident defendant and forum state; use of interstate facilities, such as telephones or mail, cannot alone provide minimum contacts required by due process"); *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir. 1979) ("Merely entering into a contract with a forum resident does not provide the requisite contacts between a defendant and the forum state."). For example, in *Dairy Farmers of America, Inc. v. Bassett & Walker International, Inc.*, 702 F.3d 472 (8th Cir. 2012), a Missouri corporation ("DFA") brought a breach-of-contract action against a Canadian corporation ("Bassett") in federal court in Missouri. The Eighth Circuit held that "the district court could not constitutionally exercise jurisdiction over Bassett," *id.* at 477, even though (1) "Bassett solicited DFA's business knowing that DFA had a Missouri headquarters," *id.* at 478; (2) Bassett entered into about 80 contracts with DFA over a 19-month period for the delivery of more than 3.5 million pounds of dairy products, *id.* at 474; (3) Bassett received a $400,000 line of credit from DFA, *id.*; and (4) Bassett regularly communicated by phone and email with DFA's Missouri headquarters about its line of credit and about delivering and billing for the dairy products, *id.*

Finally, BZL has failed to adequately plead that Hartley is an alter ego of Miticorp (or any of his other companies). In order to pierce the corporate veil under *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, a plaintiff must plausibly plead

that the corporation functioned as a mere instrumentality of its dominant shareholder and that at least some of the following factors were present: "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings." 283 N.W.2d 509, 512 (Minn. 1979). BZL pleads none of the *Victoria Elevator* factors with respect to Miticorp or any other defendant. A plaintiff must also plausibly plead that piercing the corporate veil is necessary to avoid "an element of injustice or fundamental unfairness." *Id.* BZL also fails to plead this factor with respect to Miticorp or any other defendant.

For these reasons, the Court finds that it cannot exercise personal jurisdiction over Hartley, and therefore dismisses all claims against him without prejudice.

## 2. Miticorp

For the reasons just explained, no *state* court in Minnesota can exercise personal jurisdiction over Miticorp. But under Fed. R. Civ. P. 4(k)(2), a *federal* court can exercise personal jurisdiction over a defendant with respect to "a claim that arises under federal law" if "the defendant is not subject to jurisdiction in any state's courts of general

jurisdiction" and "exercising jurisdiction [over the defendant] is consistent with the United States Constitution and laws." That test is met with respect to Miticorp.

First, BZL has sued Miticorp for trademark infringement and unfair competition under the Lanham Act. Thus, BZL is making "a claim that arises under federal law."

Second, this Court cannot find that Miticorp is "subject to jurisdiction in any state's courts of general jurisdiction." Miticorp adamantly denies that it attended the trade show in Baltimore, authorized any agent to represent it at that trade show, or had any other contact with Maryland. ECF No. 68. Moreover, at the hearing on its motion to dismiss, Miticorp would not concede that Maryland or any other state could exercise personal jurisdiction over it. Taking Miticorp at its word, the Court finds that neither Maryland nor any other state can exercise personal jurisdiction over Miticorp in connection with BZL's trademark claims.

Finally, exercising personal jurisdiction is "consistent with the United States Constitution and laws." "The due process analysis under Rule 4(k)(2) is nearly identical to traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between [the defendant] and the forum state, we consider contacts with the nation as a whole." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1072 (9th Cir. 2017) (quoting *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007)); *see also Plixer Int'l, Inc. v. Scrutinizer GmbH*, No. 18-1195, 2018 WL

4357137, at *3 (1st Cir. Sept. 13, 2018) (same); *Patterson v. Aker Sols. Inc.*, 826 F.3d 231, 234 (5th Cir. 2016) (same).

Miticorp has sufficient contacts with the United States as a whole to satisfy due process. The amended complaint alleges that Miticorp was established to market products from Costa Rica to the United States (Am. Compl. ¶ 4); that Miticorp is owned and operated by Hartley, a United States citizen (Am. Compl. ¶ 23-24, 27); that Miticorp does business in the United States (Am. Compl. ¶ 27); that Miticorp reached out to BZL in the United States to inquire about getting a license to use the Blue Zones Mark (Am. Compl. ¶ 63); that Miticorp entered into an NDA with BZL in the United States (Am. Compl. ¶ 67-68); and that Miticorp exhibited at the trade show in Maryland in September 2017 (Am. Comp. ¶ 87).

All of these allegations are supported by evidence in the record. *See, e.g.*, ECF No. 68 ¶ 3. The record also contains evidence that Miticorp works with brokers in the United States (*id.* ¶ 16) and that Miticorp exhibited products at a trade show in Miami, Florida in September 2016 (ECF No. 76-1).

Because the requirements of Rule 4(k)(2) are met, this Court can exercise personal jurisdiction over Miticorp.

### 3. Premium

Premium filed a petition to cancel two of BZL's trademark registrations with the TTAB in Alexandria, Virginia. This is the only allegedly unlawful action committed by Premium. Because that conduct has no connection to Minnesota, it is not sufficient to permit a Minnesota court to exercise personal jurisdiction over Premium.

BZL nonetheless argues that the Court has personal jurisdiction over Premium because the company "is a mere instrumentality of Hartley, and they are . . . co-conspirators in a concerted scheme to force [BZL] to grant the Hartley Group a license[.]" ECF No. 75 at 3. But the amended complaint does not plausibly plead the existence of such a conspiracy. To the contrary, BZL has alleged—over and over and over again—that Hartley is the alter ego of all of his companies. Obviously, Hartley cannot conspire with himself.

For these reasons, the Court finds that it cannot exercise personal jurisdiction over Premium, and therefore dismisses all claims against it without prejudice.

### 4. Hartley Ranch and Hartley Foods

There is no evidence that Hartley Ranch or Hartley Foods has had any contact with Minnesota. BZL argues that this Court can exercise jurisdiction over Hartley Ranch and Hartley Foods because they are alter egos of Hartley and Miticorp. For the reasons already explained, the Court rejects BZL's argument. The Court finds that it

cannot exercise personal jurisdiction over Hartley Ranch and Hartley Foods, and therefore dismisses all claims against them without prejudice.

### B. Claims Against Miticorp

Having found that it may exercise personal jurisdiction over Miticorp, the Court now turns to the claims made against Miticorp in the amended complaint. Miticorp argues that no claim is supported by factual allegations sufficient to render the claim "plausible on its face." *Twombly*, 550 U.S. at 570. The Court agrees with Miticorp as to some claims, but not others.

### 1. Counts 1 and 2

Counts 1 and 2 allege trademark infringement in violation of § 32 of the Lanham Act (15 U.S.C. § 1114(1)) and unfair competition in violation of § 43 of the Lanham Act (15 U.S.C. § 1125(a)). These claims are plausibly alleged. Miticorp initially argued that BZL had not plausibly alleged that Miticorp used the Blue Zones Mark in commerce, as is required under the Lanham Act. *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). At the hearing, however, Miticorp as much as conceded that this requirement has been met, given that BZL alleges that Miticorp displayed the Blue Zones Mark on coconuts at a trade show in Baltimore, and given that coconuts do not grow in Maryland. The Court also notes that the directory for the trade show identifies Miticorp as hailing from "Plantation, FL." ECF No. 54-9 at 2. BZL has plausibly alleged all of the elements of a

trademark-infringement claim and an unfair-competition claim, and therefore

Miticorp's motion to dismiss Counts 1 and 2 is denied.

### 2. Count 3

Count 3 seeks a declaration regarding the validity of the Blue Zones Mark. But

Premium has been dismissed from the case, and the amended complaint does not

plausibly allege that Miticorp had any role in filing the petition to cancel two of BZL's

trademark registrations. Nor does the amended complaint allege that Miticorp has

taken any other action to challenge the validity of any mark owned by BZL.

Accordingly, Miticorp's motion to dismiss Count 3 is granted.

### 3. Count 4

Hartley (acting on behalf of Miticorp) accused BZL of breaching the NDA at least

three times in emails to Buettner. In a June 22, 2017 email, Hartley told Buettner that he

was "disappointed that the terms of our NDA were violated." ECF No. 54-8 at 2. In a

July 6, 2017 email, Hartley scolded Buettner: "[Don't] speak to me on morality as you

personally violated our NDA." ECF No. 54-7 at 2. And sometime after that (the date is

unclear), Hartley told Buettner that "I have absolute proof that you violated [the

NDA]." ECF No. 76-3 at 2. In Count 4, BZL seeks a declaration that it did not, in fact,

violate the NDL as Hartley alleges.

Miticorp moves to dismiss Count 4, arguing that, because Hartley never threatened to sue BZL, the question of whether BZL breached the NDA is not justiciable under the Declaratory Judgment Act or Article III of the United States Constitution. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Cass Cty. v. United States*, 570 F.2d 737, 740 (8th Cir. 1978) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

The Eighth Circuit appears not to have addressed the question of whether the fact that one party to a contract has accused another party to the contract of breaching the contract is sufficient to give a federal court jurisdiction over a declaratory-judgment action regarding the contract. Having reviewed the relevant authority and Hartley's emails, however, the Court finds that Hartley's multiple sharp accusations that BZL violated the NDA—along with the contentious legal relationship between the parties—create a controversy of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Md. Cas. Co.*, 312 U.S. at 273). Accordingly, Miticorp's motion to dismiss Count 4 is denied.

### 4. Counts 5 and 6

Counts 5 and 6 allege that Miticorp is liable under the Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.44) and the Minnesota common law of unfair competition because it infringed the Blue Zones Mark at the trade show in Baltimore. BZL thus seeks to apply a Minnesota statute and Minnesota common law to conduct that occurred in Maryland and that had no connection to Minnesota, save for the fact that the owner of the infringed mark was a Minnesota company.

The Due Process Clause "limits the power of a forum state to apply its substantive law to factual and legal situations with which it has little or no contact." *McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578, 580 (8th Cir.), *aff'd*, 454 U.S. 1071 (1981). The law of a particular state cannot be applied to a legal dispute unless the state "has had . . . significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981).

As the Eighth Circuit has recognized, "the due process limitation upon a state's extraterritorial application of law mirror[s] the due process analysis for determining the limits of a state court's judicial jurisdiction." *McCluney*, 649 F.2d at 581. In other words, "where a state's contacts with the parties or the transaction satisfy the 'significant contacts' test for personal jurisdiction"—that is, where a state court can exercise

personal jurisdiction over the parties to a dispute—"no party may reasonably expect that the state's law cannot control the case." *Olson v. Push, Inc.*, 640 F. App'x 567, 571 (8th Cir. 2016) (citing *McCluney*, 649 F.2d at 580-82). Conversely, it is difficult to imagine that application of a state's law would *not* be arbitrary or fundamentally unfair where a state's contacts do *not* satisfy the significant contacts test for personal jurisdiction; if the Due Process Clause would bar a state's *courts* from adjudicating a dispute, it is hard to see how laws enacted by the state's *legislature* could control that same dispute.

In this case, a Minnesota state court could not exercise personal jurisdiction over Miticorp, as discussed above.[3] Miticorp's conduct in displaying coconuts with the Blue

_____

[3]For a Minnesota court to exercise personal jurisdiction over Miticorp, the company must have had sufficient contacts with *Minnesota* to pass muster under the Due Process Clause of the Fourteenth Amendment. But for a federal court to exercise personal jurisdiction over Miticorp, the company must have had sufficient contacts with *the United States* to pass muster under the Due Process Clause of the Fifth Amendment. As the D.C. Circuit recently explained:

> The only difference in the personal-jurisdiction analysis under the two Amendments is the *scope* of relevant contacts: Under the Fourteenth Amendment, which defines the reach of state courts, the relevant contacts are state-specific. Under the Fifth Amendment, which defines the reach of federal courts, contacts with the United States as a whole are relevant.

*Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 (D.C. Cir. 2017) (footnote omitted). Thus, this Court can exercise personal jurisdiction over Miticorp even though a Minnesota state

(continued...)

Zones Mark at a trade show in Maryland had no connection whatsoever to Minnesota, save for the fact that a Minnesota company happened to own the infringed mark. Again, the Supreme Court has been clear that, in order for a state's courts to exercise personal jurisdiction over a defendant, the defendant's conduct must be connected to the *forum*, and not merely to the *plaintiff*. *See Bristol-Myers Squibb*, 137 S. Ct. at 1781. Because Minnesota's contacts with this dispute do not "satisfy the 'significant contacts' test for personal jurisdiction . . . the state's law cannot control the case." *Olson*, 640 F. App'x at 571.

For these reasons, Counts 5 and 6 are dismissed.

### 5.  Count 7

Count 7 asserts a claim of fraudulent misrepresentation based on various fibs that Hartley allegedly told when he was trying to persuade BZL to issue Miticorp a license—such as statements that his companies sold millions of dollars in frozen food products to Walmart and that he had licensing deals with TGI Friday's and Jack Daniels.  Am. Compl. ¶ 154.  To plead a viable fraudulent-misrepresentation claim, BZL must plausibly plead (among other things) that it did, in fact, act in justifiable reliance on the false misrepresentation and suffered damages as a proximate cause of the

---

[3](...continued)
court cannot.

representation.  *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 956 F.2d 1484, 1493 (8th Cir. 1992).

Of course, Hartley failed to persuade Miticorp to issue a license to him, and thus it is difficult to understand how BZL could have been harmed by Hartley's alleged lies. BZL pleads in a conclusory manner that it "acted in reliance on these fraudulent misrepresentations by foregoing subsequent business development and licensing opportunities with third parties[.]"  Am. Compl. ¶ 157.  But BZL does not identify a single business opportunity that was lost because BZL relied on Hartley's boasting.  To the contrary, the amended complaint portrays the negotiations between BZL and Hartley as slow and sporadic and implies that BZL was wary of Hartley and skeptical of his claims.  Count 7 is therefore dismissed.

### 6.  Count 8

Count 8 alleges trademark counterfeiting in violation of §§ 32(1), 34(d), and 35(b) of the Lanham Act, 15 U.S.C. §§ 1141(1), 1116(d), 1117(b).  Miticorp concedes that, if Counts 1 and 2 survive, so does Count 8.  Counts 1 and 2 survive.

### 7.  Count 9

Count 9 represents BZL's attempt to turn this unremarkable trademark-infringement case into a RICO case.  The attempt fails.

To plead a viable RICO claim for damages, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). The elements of a RICO claim must be pleaded with respect to each individual defendant, *see Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008), and with particularity under Fed. R. Civ. P. 9(b), *see Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).

There are multiple problems with BZL's civil RICO claim against Miticorp, two of which the Court discussed at the hearing on the motion to dismiss:

First, "to establish liability under [18 U.S.C.] § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). In other words, the RICO defendant (here, Miticorp) must be distinct from the enterprise. The amended complaint identifies the enterprise as the "Hartley Enterprise," which consists of "all Defendants." Am. Compl. ¶ 169. The amended complaint also alleges—and BZL repeatedly argues—that "Hartley . . . is the alter ego . . . of all Defendants." Am. Compl. ¶ 65; *see also* ECF No. 75 at 2 (". . . Miticorp, like the other corporate defendants in this case, is a mere instrumentality of Defendant Dwight Hartley . . . ."). Obviously, then, if the enterprise

is made up of all defendants, and if all defendants are alter egos of Hartley, then

Miticorp is not a person that is separate from the enterprise.[4]

Second, under longstanding Eighth Circuit precedent, an alleged RICO

enterprise must also have "an ascertainable structure distinct from the conduct of a

pattern of racketeering." *Crest Const. II*, 660 F.3d at 354 (quoting *United States v. Lee*, 374

F.3d 637, 647 (8th Cir. 2004)); *see also United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.

1982) ("[A]n enterprise cannot simply be the undertaking of the acts of racketeering,

neither can it be the minimal association which surrounds these acts."). Whether the

enterprise has a structure that is distinct from the pattern of racketeering activity turns

on whether the enterprise would still exist if the conduct that constitutes the

racketeering activity were absent. *See Crest Const. II*, 660 F.3d at 354-55 (citing *Handeen*

---

[4]It is true, as BZL argues, that the Supreme Court held in *Cedric Kushner* that the owner of a corporation was distinct from the corporation for purposes of the "separateness" requirement of RICO. But in reaching that conclusion, *Cedric Kushner* was clearly addressing a situation in which the corporate form was respected and the corporation was regarded as legally distinct from its owner. Here, though, Hartley is alleged to be the alter ego of Miticorp. In other words, BZL alleges that Miticorp's corporate form should *not* be respected and that Hartley and Miticorp should *not* be regarded as legally distinct. If Miticorp is not legally distinct from Hartley (or his other companies), then it is impossible for Miticorp to be a "person" that is separate from the "Hartley Enterprise." *See Moorer v. Stemgenex Med. Grp., Inc.*, No. 3:16-CV-02816-AJB-NLS, 2017 WL 1281882, at *12 (S.D. Cal. Apr. 6, 2017) ("[A]s currently pled, the Court cannot reconcile Plaintiffs' alter ego theory of liability, that the 'individuality and separateness' of StemGenex, the other entities, and individuals have ceased, with Plaintiffs' contention that the RICO enterprise is distinct from its persons, i.e. that StemGenex is separate from Defendants Alexander and Lallande.").

*v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997)); *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir. 1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense.").

BZL alleges that the Hartley Enterprise is "a concerted scheme to force Plaintiff to grant the Hartley Group a license, and if the license is refused, to misappropriate Plaintiff's valuable trademark rights." ECF No. 75 at 3. Although BZL seems to concede that *individual defendants* may do some legitimate business, BZL does not allege that the *enterprise* does anything other than engage in the alleged racketeering activity. A RICO enterprise must "consist[] of more than simple conspiracies to perpetrate the predicate acts of racketeering." *Bledsoe*, 674 F.2d at 664. The Hartley Enterprise—as described by the amended complaint—does not.

For these reasons, the Court dismisses Count 9.

### 8. Count 10

Count 10 alleges cybersquatting in violation of the Federal Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). But the amended complaint does not allege that Miticorp engaged in any cybersquatting, nor does the amended complaint plausibly allege any basis on which Miticorp could be held liable for cybersquatting engaged in by other defendants. Count 10 is therefore dismissed.

*C. Attorney's Fees*

Defendants request an award of attorney's fees under 28 U.S.C. § 1927. Under § 1927, a court may order an attorney to pay the opposing party's legal fees when the attorney has "multiplie[d] the proceedings . . . unreasonably and vexatiously." An award of fees under § 1927 is warranted only "when an attorney's conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1011 (8th Cir. 2006) (internal quotations omitted). The conduct of BZL's attorneys in filing a kitchen-sink complaint—while far from admirable—falls short of an "intentional or reckless disregard" of their duties to this Court. Accordingly, defendants' request for fees is denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 62] is GRANTED IN PART AND DENIED IN PART as follows:

    a.      The motion is GRANTED with respect to all claims against defendants Dwight C. Hartley, Premium Costa Rica Products, LLC, Hartley Ranch Angus Beef, LLC, and Hartley Foods, Inc. All claims against those

defendants are DISMISSED WITHOUT PREJUDICE for lack of personal

jurisdiction.

b.   The motion is GRANTED with respect to the claims asserted against

defendant Miticorp, LLC, in Counts 3, 5, 6, 7, 9, and 10 of the amended

complaint.  Those claims are DISMISSED WITHOUT PREJUDICE for

failing to meet the pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662

(2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

c.   The motion is DENIED with respect to the claims asserted against

defendant Miticorp, LLC, in Counts 1, 2, 4, and 8 of the amended

complaint.

2.  Defendants' request for an award of attorney's fees under 28 U.S.C. § 1927 is

DENIED.

Dated: October 2, 2018       s/Patrick J. Schiltz
                             Patrick J. Schiltz
                             United States District Judge